[Civ. No. 5415. Third Appellate District.—December 4, 1935.]

CITY OF LOS ANGELES (a Municipal Corporation) et al., Appellants, v. NINA B. AITKEN et al., Respondents.

Ray L. Chesebro, City Attorney, James M. Stevens, Assistant City Attorney, and Carl A. Davis, Rowan Hardin and T. B. Cosgrove, Deputies City Attorneys, for Appellants.

D. L. King, C. N. Perkins, W. H. Metson, A. Boyer, George A. Montrose, Chapman & Chapman, Thomas Wade Cochran, Athearn, Chandler & Farmer, Milton T. Farmer, Philip H. Angell and Arthur A. De Chambeau for Respondents.

THOMPSON, J.—The plaintiffs have appealed from that portion of a judgment which was rendered against them in a suit in eminent domain which imposes damages for condemnation of the littoral rights of the respondents in their separate parcels of land adjacent to Mono Lake.

One problem only is presented on this appeal. It is the question as to whether a municipality seeking to condemn the fee simple title to the littoral rights of adjacent land owners to maintain the natural level of a navigable, nontidal lake, the water of which is so impregnated with mineral salts and alkali as to render it unfit for domestic use, may avoid the payment of substantial damages in compensation therefor under the provisions of article XIV, section 3, of the Constitution of California.

Los Angeles and the Water and Power Department of that city joined in a suit in eminent domain to condemn and divert all the waters of Rush and Leevining Creeks and their several tributaries flowing into Mono Lake on the southerly side thereof, and to transport the waters of these creeks from their natural watershed to the City of Los Angeles to be used for municipal purposes. These two streams supply Mono Lake with 116 second feet of water, being 90 per cent of all the water which flows into the lake, and which volume is adequate to furnish a population of half a million people with water for domestic purposes. Only one other small creek flows into this lake. It is not involved in this litigation. The lake has no outlet. It is situated in a volcanic mountainous region east of the Yosemite Valley. It has an elevation of 6,426 feet above the level of the sea. This elevation has remained substantially the same during all of the time of which we have knowledge. The lake is unique in its character, occupying a depression in the midst of lofty mountains and extinct volcanic cones. It is ten miles in width and fifteen miles in length with a maximum depth of 150 feet. In the middle of the lake are two small islands. The water of the lake is permeated with mineral salt and alkali to such an extent that it is unfit for domestic use or for irrigation.

Mono Lake is situated on the now famous Tioga highway connecting Los Angeles with Lake Tahoe. From Mono a frequently traveled thoroughfare extends through a timbered country to the Yosemite Valley. The picturesque beauty, the highly colored rocks and precipitous walls and the rare surroundings of Mono Lake attract an increasing number of tourists to its popular resorts. John Muir, the late famous exploring scientist, half a century ago said of this locality:

"This beauty . . . is of a still higher order, enticing us lovingly on through gentian meadows and groves of rustling aspen to Lake Mono, where, spirit-like, our happy stream vanishes. . . . Mountains, red, gray, and black, rise close at hand on the right, whitened around their bases with banks of enduring snow; on the left swells the hugh red mass of Mount Gibbs, while in front the eye wanders down the shadowy cañon, and out on the warm plain of Mono, where the lake is seen gleaming like a burnished metallic disc, with clusters of lofty volcanic cones to the south of it."

In addition to the respondents who are interested in this appeal, many other owners of property situated on the borders of the lake and riparian to the two condemned streams were made party defendants. In a preliminary hearing of this cause it was determined that the condemnation of the waters of Rush and Leevining Creeks by the City of Los Angeles was a necessity. There is no controversy regarding that feature of the case.

The second amended complaint alleges that the littoral rights of the respondents' property "sought to be so taken and acquired" is:

"Division Six: The fee simple estate in and to all littoral or riparian rights to the maintenance of the level of Mono Lake by the discharge thereinto of the above named creeks, together with all rights to the continued flow of the surface and percolating waters of said creeks, and the right to the continued use of the same within the watershed thereof.

"A. That said littoral and riparian rights include all rights to the maintenance of the level of the waters of Mono Lake by the discharge thereinto of the above named creeks, together with all rights to the continued flow of the surface of percolating waters of said creeks, and the right to the continued use of the same within the watershed thereof, and which said rights are a part and parcel of the following described lands

along which the shoreline of Mono Lake in its natural state extends, to-wit:'' (Here follows the description of the various parcels of land belonging to the respondents.)

The several properties of the respondents are adjacent to the lake, but do not border on Rush or Leevining Creeks, with the exception of the land of J. B. Clover which is situated at the mouth of Rush Creek. The various tracts of land, with the exception of the last-mentioned one, are somewhat remote from the vicinity of these condemned streams. Three of them, owned respectively by Cunningham, Billeb and Venita McPherson, are located at the western extremity of the lake. Those belonging to Wiseman, Stott and the estate of Samman, deceased, are situated at the eastern extremity of the lake. The property of Wallis McPherson is located on one of the islands in the center of the lake. These properties are maintained chiefly as resorts for the accommodation of the traveling public. One or two of them are mere auto camps. All of them contain substantial improvements. Some of them have small gardens, shrubs and flowers. The Cunningham place includes 26 acres of land with valuable buildings, including a hotel, store, cottages and a gas station. This property is estimated to be worth $200,000 and is widely known as the Tioga Lodge. The Venita McPherson place consists of a tract of 135 acres of land with valuable buildings and improvements, commonly known as Mono Inn. Each of the other properties have improvements which render them of an estimated value of more than double the amount of the judgment recovered by their respective owners.

The cause was tried with a jury. Substantial evidence was adduced at the trial to the effect that the diverting of all of the waters of Rush and Leevining Creeks will result in reducing the lake to one-tenth of its present volume of water within five to ten years, leaving the bed of the lake and the exposed mud flats covered with a thick crust of mineral salt or trona which will pulverize and fly with every breeze that blows over the surrounding land, ruining all vegetation and destroying the fertility of the soil. There is evidence that all of these properties will be thereby damaged to an extent of three-fourths to nine-tenths of their values. Even the plaintiffs' expert witnesses conceded that the diverting of the waters of these streams will ultimately result in practically draining the

lake of most of its water. They admitted these properties would be thereby greatly decreased in value. Indeed, the appellants do not deny that these properties will be substantially damaged in value by the diverting of the two streams which supply practically all of the water of Mono Lake. But the appellants assert that since the water of the lake is saline or alkaline in its nature, and therefore unfit for domestic use or irrigation, the respondents are using it for no beneficial purpose to their lands and therefore under the provisions of article XIV, section 3, of the Constitution of California, they are entitled to no more than nominal damages in compensation for their littoral rights thereto.

The attractions of the traveling public for Mono Lake include its unusual and picturesque location, the beauties of its surroundings and the pleasure of boating, bathing and the hunting of wild ducks and geese which frequent the lake in large numbers during certain seasons. The evidence indicates that the respondents depend for their livelihood and the maintenance of their resorts chiefly on the incomes derived from their transient guests and customers. When the lake is destroyed, the surrounding country will be converted into a desert and their properties will become valueless.

The jury returned verdicts in favor of the several respondents and the court rendered judgment accordingly for the following amounts:

For the littoral rights of Venita McPherson incident to her Mono Inn property consisting of 134.71 acres of land, the sum of . . . . . . . . . . . . . . . . . . $85,000.00

For Cunningham incident to her Tioga Lodge property consisting of 25.87 acres of land the sum of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85,000.00

For Wiseman incident to his 307.99-acre tract of land, the sum of . . . . . . . . . . . . . . . . . . . . . . . . . . 7,700.00

For Wallis McPherson incident to his island tract of 640.33 acres of land, the sum of . . . . . . . . . . . 35,000.00

For defendants Billeb incident to their 118.67-acre tract of land, the sum of . . . . . . . . . . . . . . . . . . 40,000.00

For the littoral rights incident to the 160-acre tract of land belonging to the estate of Samman, deceased, the sum of . . . . . . . . . . . . . . . . . . . . . . . . 3,750.00

For the separate 77.88-acre tract belonging to the same estate, the additional sum of . . . . . . . . . . . 1,326.00

For the littoral rights of the 318.79-acre tract of
    land belonging to Clover at the mouth of Rush
    Creek, the sum of.........................\$20,000.00
For Stott incident to his 32.56-acre tract of land,
    the sum of .............................. 1,061.00

From that portion of the judgment which awards the respondents the foregoing substantial sums of money as damages for their littoral rights to require the maintenance of the natural level of Mono Lake the plaintiffs have appealed. It is claimed the court erred in refusing to strike from the record the evidence of substantial damages with respect to the littoral rights of each and all of the properties belonging to these respondents, and in refusing to instruct the jury accordingly, and that, on the contrary, all that any of the respondents are entitled to in compensation for their littoral rights is mere nominal damages.

We are of the opinion the respondents are entitled to substantial damages to compensate them for the appropriation of their littoral or marginal property rights by the plaintiffs; that the judgment is adequately supported by the evidence, and that the use and benefits of Mono Lake incident to their littoral property rights therein are neither unreasonable nor in conflict with the provisions of article XIV, section 3, of the Constitution of California. It follows that the court properly refused to strike from the record the evidence of substantial damages. It also properly refused to instruct the jury that these littoral property rights of the respondents may be compensated for by the payment of mere nominal damages and it properly denied the plaintiffs' motion, under the provisions of section 663 of the Code of Civil Procedure, to vacate the decree and render a different judgment for nominal damages only.

There can be no doubt that Mono Lake is a navigable body of water. It is large and deep and susceptible of use as a public highway for the conveyance of persons and property by means of commercial vessels. (*Churchill Co.* v. *Kingsbury,* 178 Cal. 554, 558 [174 Pac. 329]; *People* v. *Truckee Lumber Co.,* 116 Cal. 397, 401 [48 Pac. 374, 58 Am. St. Rep. 183, 39 L. R. A. 581]; 26 Cal. Jur. 296, secs. 512, 513.) The court will take judicial notice of the fact that a lake which is ten miles wide and fifteen miles in length with an average depth which will readily float large vessels and is

susceptible of use as a public highway for transporting persons and property for commercial purposes, as unquestionably Mono Lake is so adapted, is a navigable lake. (*People* v. *Truckee Lumber Co., supra.*)   ■   The state of California is, therefore, the owner of the land bordering on the margin thereof below the low-water mark. (Sec. 670, Civ. Code.) On the contrary, the title of the respondents to their respective tracts of land which are involved herein, extends to low water mark. (Sec. 830, Civ. Code.)

The appellants contend that since the water of Mono Lake is unfit for domestic use or for irrigation purposes for the reason that it is heavily impregnated with mineral salt and alkali which may not be extracted by the respondents except by consent of the state (Stats. 1911, p. 1154; 2 Deering's Gen. Laws of 1931, p. 2432, Act 4935), and that their use of the lake is confined to boating, bathing and hunting, which are privileges common to the general public, their littoral rights by virtue of the fact that their properties border on the margin of this navigable lake are in conflict with the provisions of article XIV, section 3, of the Constitution and, therefore, they are not compensable in substantial damages. The respondents have not attempted to extract the mineral salts from the water of Mono Lake and claim no intention or right to do so. It is true that the pumping of water from a well to flood a duck preserve for the purpose of hunting wild game which may be thereby attracted to the property is a nonbeneficial use of the water on the land, which is prohibited by law as a waste of water intended for domestic use and for irrigation. (*Ex parte Elam*, 6 Cal. App. 233, 237 [91 Pac. 811] ; *In re Maas*, 219 Cal. 422, 426 [27 Pac. (2d) 373].)   ■ It is also true that the mere privilege of bathing, boating and hunting on a navigable lake by the owner of marginal property thereon, is not such a beneficial use of the lake as will entitle one to compensatory damages for the destroying of those advantages. In the present case, however, the respondents are not complaining of their loss of the personal privileges of bathing, boating or hunting on Mono Lake. They purchased land bordering on this unique lake and constructed buildings and improvements thereon for the maintenance of auto camps and pleasure resorts which are dependent for their success upon the income derived from the traveling public which is attracted to this alluring lake by these advantages.

These enterprises depend on the continuation of these attractions. Without the existence of this lake and its surrounding attractions the value of the respondents' properties will be practically destroyed. These privileges and attractions constitute important assets in determining the value of their properties. Moreover, among the essential littoral rights which are possessed by the respondents is their lawful right to the unmolested access to the lake.

In the interest of justice the property rights of individuals should be carefully guarded. Governments are intended primarily to protect the rights of their individual citizens. The equitable and well-established doctrine of eminent domain should not be invaded in the guise of the exercise of police powers so as to deprive individuals of their property rights without just compensation. Neither the Constitution nor the laws of California are intended for any such unjust purpose. It has been held that the owner of land littoral to a navigable body of water, as an incident to his right to use a boat thereon, may build and maintain a dock to enable him to reasonably use the lake and land his boat on his own property so long as it does not interfere with the rights of others. (*Dolbeer* v. *Suncook Water Works Co.*, 72 N. H. 562 [58 Atl. 504].) In 67 Corpus Juris, page 852, section 279, it is said:

"One who owns land adjacent to a natural lake is entitled to have the waters therein preserved in their natural state. Thus a riparian owner is entitled to have the waters of the lake on which his property abuts remain at their accustomed level without interference."

In Black's Pomeroy on Water Rights, page 8, section 6, it is said a riparian owner of land adjoining a fresh-water, nonnavigable stream, as an incident to his littoral rights, is entitled to compensation for interfering with the enjoyment of an undiminished and unobstructed flow of the water, and that:

"This is also true of fresh-water navigable streams and small lakes within the state where the tide does not ebb and flow; save that the public has an easement in such waters for the purpose of travel, as on a public highway, which easement, as it pertains to the sovereignty of the state, is inalienable, and gives to the state the right to use, regulate, and control the waters for the purposes of navigation. This public easement gives the state no right to convert the waters, or to

authorize their conversion, to any other uses than those for which the easement exists; that is, for the purposes of navigation. The right to divert the water for other uses, although public in their nature, can only be acquired under and by virtue of the sovereign right of eminent domain, *and upon making just compensation."*

In accordance with the preceding principle it is said on page 9 of the last-cited authority that the owner of a mill, which was situated on a stream near the outlet of Lake Hemlock in New York, a navigable lake seven miles in length and half a mile wide, was entitled to relief against the city of Rochester for greatly reducing the volume of water in the lake and for diminishing the stream, under authority of an act of the legislature, so as to impair the efficiency of the mill by pumping from the lake 4,000,000 gallons of water daily and conveying it by means of an aqueduct a great distance to the city of Rochester for municipal purposes.

In the recent case of *Litka* v. *City of Anacortes,* 167 Wash. 259 [9 Pac. (2d) 88], it was held that the owner of property adjacent to nonnavigable Lake Campbell which had an area of 320 acres, who constructed a dwelling house, bath houses, cabins and a dock thereon, using the place as a resort where he ran a small store, served meals, rented boats and conducted a bathing beach and camping ground, and *which had no value for agricultural purposes,* was entitled to just compensation against the city of Anacortes for damage to his property resulting from its pumping nearly all of the water from the lake for municipal purposes, leaving an unsightly barren mud flat in lieu thereof. The court said:

"When the city appropriated the water from the lake, it took from the respondents the very thing that was necessary and essential to the use of their property, and a valuable property right."

Under very similar circumstances the Supreme Court of Washington held in the case of *Martha Lake Water Co.* v. *Nelson,* 152 Wash. 53 [277 Pac. 382], that the company could not appropriate the water of a nonnavigable lake to be used on nonriparian land, without first condemning the riparian rights of owners of land bordering thereon, and paying them just compensation for the detriment to their property as a result thereof.

The appellants seek to distinguish these last-mentioned cases from the present action by asserting that since Lake Campbell and Lake Martha were nonnavigable bodies of water, the title to the lands of the complainants extended to the centers of those lakes and that their real properties were, therefore, actually damaged by the draining of the lakes. This reply, however, does not destroy the application of those principles to the present case. To be sure the littoral owners of property in the present case hold to the low-water mark of Mono Lake only on account of its being a navigable body of water. But the maintenance of their auto camps and pleasure resorts was the same as that which was involved in the Anacortes case. Moreover, these respondents had the absolute and incontestable right to the free and unobstructed access to the body of the lake. The appellants recognize that right by seeking to condemn ''all littoral or riparian rights to the maintenance of the level of Mono Lake''. When the appellants acquired fee simple title to that interest in respondents' properties they thereby constructed a veritable ''Chinese Wall'', effectively barring the owners from the use of that vital privilege and valuable property right. We are convinced this may not be done without first paying just compensation therefor. In states where the riparian doctrine has been abrogated with respect to the use of water for domestic and irrigation purposes, the rights of littoral owners of land bordering on navigable bodies of water to free and unobstructed access thereto is recognized. (*Shephard* v. *Coeur d'Alene Lumber Co.*, 16 Idaho, 293 [101 Pac. 591]; *Gasman* v. *Wilcox*, 54 Idaho, 700 [35 Pac. (2d) 265].)

■ The state, itself, may not interfere with navigable streams and lakes within its borders, except to regulate, protect and preserve the easement of the public therein for the purpose of navigation, unless such acts are exercised under the doctrine of eminent domain with the payment of just compensation for the damage resulting to private property (*People* v. *Russ*, 132 Cal. 102 [64 Pac. 111]), or pursuant to the enforcement of its police powers. ■ The draining of the water of Mono Lake, by acquiring the riparian rights to Rush and Leevining Creeks, which are practically its only source of supply, is not a valid exercise of police powers justifying the appropriation of respondents' littoral rights on the lake, without the payment of just compensation. Private

property may not be taken in the guise of police power under the circumstances of this case without condemnation and the payment of just compensation. The distinction between the application of the principles of eminent domain and police powers is clearly stated in the case of *Conger* v. *Pierce County*, 116 Wash. 27 [198 Pac. 377, 18 A. L. R. 393], where it is said with respect to the alleged improvement of the Puyallup River, a navigable stream, that the principle upon which the police power is based,

"Does not authorize the taking or damaging of private property in the sense used in the constitutions with reference to taking such property for a public use. Eminent domain takes private property for a public use, while the police power *regulates* its use and enjoyment, or, if it takes or damages it, it is not a taking or damaging for the public use, but to conserve the safety, morals, health, and general welfare of the public."

In the case of *Gin S. Chow* v. *City of Santa Barbara*, 217 Cal. 673, at page 701 [22 Pac. (2d) 5], it is said in that regard:

"There is a well-recognized and established distinction between a 'taking' or 'damaging' for public use and the *regulation* of the use and enjoyment of a property right for the public benefit. The former falls within the realm of eminent domain, and the latter within the sphere of the police power."

In the preceding case a judgment was affirmed which denied the plaintiffs an injunction to prevent the city of Santa Barbara from impounding and diverting from the Santa Ynez River extraordinary storm waters which were not a part of the ordinary flow of the stream, and which were not beneficial to the lands of the riparian owners. Commenting on similar cases the court said in that regard:

" 'These decisions in effect establish the just rule that flood waters, which are of no substantial benefit to the riparian owner or to his land, and are not used by him, may be taken at will by any person who can lawfully gain access to the stream, and conducted to lands not riparian, and even beyond the watershed, without the consent of the riparian owner and without compensation to him. They are not a part of the flow of the stream which constitutes "parcel" of his land, within the meaning of the law of riparian rights.' "

In the present case the littoral rights of the respondents are dependent on the maintenance of the natural level of the lake, and the privilege of access thereto, and are beneficially affected by the presence of the lake in its natural condition as heretofore related.

█ The appellants, however, assert that these principles are all abrogated by the provisions of article XIV, section 3, of the Constitution of California. We think not. Article XV, section 1, of the Constitution specifically applies the doctrine of eminent domain to the acquiring of littoral rights of property bordering on navigable waters within the state. It provides:

"The right of eminent domain is hereby declared to exist in the State to all frontages on the navigable waters of this State."

Article XIV, section 3, of the Constitution, relied upon by the appellants as authority confining the compensation of the respondents in this case to mere nominal damages, reads as follows:

"Sec. 3. Conservation of water. It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this state is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or watercourse attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and

use, or of depriving any appropriator of water to which he is lawfully entitled. This section shall be self-executing, and the legislature may also enact laws in the furtherance of the policy in this section contained."

The respondents deny the application of article XIV, section 3, of the Constitution to the property owner's rights riparian to a lake as distinguished from a flowing stream, and assert that the arbitrary taking and diverting of water from a lake for use in another watershed, to the detriment of a riparian owner of land thereon, without first paying just compensation therefor, violates the provisions of article XIV of the federal Constitution which prohibits the taking of property without due process of law.

These contentions have been determined adversely to the respondents by the recent cases of *Peabody* v. *City of Vallejo*, 2 Cal. (2d) 351 [40 Pac. (2d) 486], and *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.*, 3 Cal. (2d) 489 [45 Pac. (2d) 972, 1014]. In the Peabody case the Supreme Court has clearly, concisely and definitely held that the provisions of article XIV, section 3, of the California Constitution apply to water rights in lakes, ponds and flowing streams. It says in that regard:

"1. The right to the use of water is limited [under the constitutional amendment referred to] to such water as shall be reasonably required for the beneficial use to be served.

"2. Such right does not extend to the waste of water.

"3. Such right does not extend to unreasonable use or unreasonable method of diversion of water.

"4. Riparian rights attach to, but to no more than so much of the flow as may be required or used consistently with this section of the Constitution.

"The foregoing mandates are plain, they are positive, and admit of no exception. They apply to the use of all water, under whatever right the use may be enjoyed."

The result of the application of this constitutional amendment is definitely held to have changed the former recognized right of a riparian owner of land to the entire flow of the stream in its natural condition, regardless of its necessary or beneficial use to his land, and that only so much of the water is now protected as is reasonably necessary for beneficial use thereof. This change wisely abrogates the old doctrine that a riparian owner of land may enjoin an interference with the

full, natural flow of a stream regardless of whether it is useful or beneficial to his land. We see no reason why this economical principle which was adopted for the public welfare because of the rapidly increasing demands for water should not apply to lakes as well as flowing streams. The Supreme Court has clearly said that it does apply "to all water" of the state. The preamble of section 3 of article XIV of the Constitution declares that "the general welfare requires that *the water resources of the State* be put to beneficial use". Unquestionably, the legislature intended to include lakes in this term which is designated as "water resources of the State". Nor do we believe that a lake is excluded from the application of this amendment merely because it is navigable.

The federal government has reserved no right to regulate navigation on bodies of water which are wholly within the borders of this state. Interstate regulation of navigable waters is not involved in this case. Mono Lake is wholly within the confines of California. It is said in the Peabody case regarding the alleged infringement on the provision of the federal Constitution prohibiting the taking of property without due process of law, that:

"The attitude of the Supreme Court of the United States has been consistent in leaving the question of private water rights, which do not involve federal or interstate interests, to the control of local state policies."

But this limitation of riparian rights of owners of land to a necessary use for beneficial purposes does not mean that the water must be actually used in irrigating the land or consumed for domestic purposes. It does not authorize the appropriation of littoral rights to land bordering on the margin of a lake without the payment of just compensation therefor, when the very value of the land depends on the maintenance of the lake in its natural condition. Irrigation and household uses of water are not the only reasonable or beneficial purposes for which it may be employed, even though the presence of mineral salts or alkali in the water renders it unfit for human consumption or domestic use.

For the reason that the existence of Mono Lake in its natural condition, with all of its attractive surroundings, is the vital thing that furnishes to the respondents' marginal land almost its entire value, and that the draining of the lake will nearly destroy the value of their properties and the in-

cident littoral rights thereto, it seems clear that the lake is not being used by the respondents for an unreasonable or non-beneficial purpose, but, upon the contrary, that their use of the lake in its natural condition is reasonably beneficial to their land, and the littoral rights thereof may therefore not be appropriated, even for a higher or more beneficial use for public welfare, without just compensation therefor.

It follows that the court did not err in refusing to charge the jury that the respondents were entitled to nominal damages only, and that the court properly denied the appellants' motion under the provisions of section 663 of the Code of Civil Procedure to set aside the judgment and render a different judgment for nominal damages only.

The judgment is affirmed.

Plummer, J., and Pullen, P. J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 30, 1936.